IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **VONDA PEARSON** : <br> *AS ADMINISTRATRIX OF THE* : <br> *ESTATE OF CORNELL D. PEARSON* : <br> : <br> **v.** : <br> : <br> **MARPLE TOWNSHIP,** *et al.* : | **CIVIL ACTION** <br> **No. 23-4444** |

| | |
|---|---|
| **McHUGH, J.** | **August 21, 2025** |

### MEMORANDUM

This case arises from the tragic death of Cornell Pearson, who was fatally struck by a vehicle when he tried to cross West Chester Pike in an intoxicated state. Shortly before the accident, a Marple Township police officer had brought Mr. Pearson to a bus stop there, trying to facilitate Pearson's trip back to his home in Philadelphia. Pearson's estate asserts that the officer's conduct that night put Mr. Pearson in harm's way and represents a "state created danger" actionable under the 14th Amendment. In Plaintiff's view, the facts here mirror the seminal case of *Kneipp v. Tedder*, which first recognized the state created danger doctrine in the Third Circuit. 95 F. 3d 1199 (3d Cir. 1996). But the record here is far weaker than in *Kneipp*, as Plaintiff cannot show any affirmative act by the responding officer that materially placed Mr. Pearson at greater risk than he already was. And mere negligence or poor judgment does not rise to the level of conscience-shocking behavior required to prove a deprivation of constitutional rights. I am therefore constrained to grant Defendants' motion for summary judgment.

**I.     Relevant Background**

Because state created danger claims are highly fact specific, a comprehensive review of the relevant facts is warranted.

### A.  Mr. Pearson's Shopping Trip

On November 13, 2021, Cornell Pearson joined his best friend, Kevin Thomas, on a shopping trip to a strip mall in Springfield, Pennsylvania. Response to Mot. for Summ. Judg. at 3, ECF 51 ("Resp.").[1]  Mr. Thomas drove several of his family members and Mr. Pearson from Philadelphia to the mall, where everyone parted ways to shop.  Thomas Dep. 33:11-34:4.  Thomas recalled that the parking lot was "very crowded" when they arrived in the early evening.  *Id.* 37:23. After about an hour and a half, everyone except Mr. Pearson had returned to the car.  *Id.* 38:6-22. Thomas testified that he tried multiple times to reach Pearson on the phone, who eventually called and said he was "coming back out."  *Id.* 41:20.  Mr. Thomas described Pearson as sounding normal but also admits that he "can't tell when anyone's impaired."  *Id.* 36:1-3, 42:5-8.  Thomas and his family waited for several more minutes before driving home without Pearson.  *Id.* 45:7-18.

It is unclear from the record where Mr. Pearson went or what he did at the mall.  At some point, Pearson ran into his niece, Naiesha Cook, inside Marshalls.  Ms. Cook recounted that she had a brief conversation with her uncle, who "appeared to be confused," but "wasn't bothering anybody."  Ex. E, 38:22, 85:25, ECF 47 ("Cook Dep.").  Ms. Cook offered to give him a ride home, but Pearson told her that Thomas was waiting.  *Id.* 38:22-25.  Ms. Cook represented that she felt comfortable leaving Pearson, knowing that he had a ride home.  *Id.* 38:17-25.

### B.  Mr. Pearson's Attempted Journey Home

At 7:21 pm, Marple Township Police officers were dispatched to Marshalls to respond to a complaint about a suspicious person looking into vehicles in the parking lot.  Resp. at 2-3. Officer David Lerro approached Mr. Pearson, while supervising Officers Ditmer and Stiles stood

---

[1] The Court adopts the sequential pagination assigned by the CM/ECF docketing system.

by as backup.² ECF 47 at 57 ("Stiles Dep."); *Id.* at 59 ("Ditmer Dep."). Officer Lerro told Mr. Pearson that someone had complained about him and asked him to leave the area to avoid any further escalation. *Id.*; Resp. Ex. C, 40:11-19, ECF 51 ("Lerro Dep.").

Mr. Pearson told Officer Lerro that he was waiting for his girlfriend to finish work at Marshalls and asked if Lerro could drive him home to Philadelphia. Lerro Dep. 79:2-6. The record does not reflect any steps taken by Officer Lerro to confirm whether Pearson knew anyone inside Marshalls. At the outset of the case, Plaintiff's theory was that Mr. Pearson's girlfriend, Robin Bolling Barkley, was at the mall and prepared to drive Pearson home, and that Officer Lerro deprived him of safe transit by needlessly removing him from the parking lot. ECF 16 at 3. Discovery undermined that theory, as Ms. Barkley testified in her deposition that she had not been at the mall at any point that day, nor had she ever worked at a Marshalls. Bolling Barkley Dep. 12:15-21, 13:10-24., 33:19-34:5.³ With his friend Mr. Thomas and his niece Ms. Cook having already left, Mr. Pearson was effectively stranded at the mall.

Officer Lerro explained that he could not leave the Township while on duty, but offered to drive Pearson to the bus stop, where he could take a bus into the 69th Street Transportation Center to get home. Lerro Dep. 42:14-18. Officer Lerro then called his supervisor, Officer Stiles, who approved the courtesy transport, and Pearson joined Lerro in his patrol car. *Id.* 51:4-7.

Mr. Pearson and Officer Lerro chatted throughout their drive to the bus stop. In the dashboard camera audio, Mr. Pearson is heard slurring his words and abruptly changing topics.

---

² Officers Ditmer and Stiles reportedly had their own separate cars on the scene and were not privy to Officer Lerro's interactions with Mr. Pearson. Stiles Dep. 17:18-19, 18:2-4, 19:16-21; Ditmer Dep. 18:7-19.

³ The full transcripts of Ms. Bolling Barkley's and Mr. Thomas' depositions were emailed to Chambers at the Court's request.

*See generally* Transport Dashboard Camera Audio ("Dashboard Audio").[4] Officer Lerro asks Pearson to repeat himself several times.[5] *Id.* at 5:41-5:55, 7:08-7:13, 8:11-8:13. Although Lerro assures Pearson that he is not in trouble, Mr. Pearson says "I ain't trying to get locked up," and later, "I'm not a thief…I'm a good guy…wrong guy . . .". *Id.* 1:35-1:39, 4:00-4:08. Lerro also asks Pearson about his favorite "drink," and tells Pearson that the brandy is "messing with [his] brain." *Id.* 6:12-17, 6:24-6:26. Officer Lerro nevertheless maintains that he did not think Mr. Pearson was intoxicated.[6] Lerro Dep. 49:21-50:5, 93:14-17.

About ten minutes later, Officer Lerro pulled up to the gas station next to the bus shelter at the intersection of West Chester Pike and Sproul Road. Incident Report, ECF 51-1. The bus shelter sits behind the curb line, sidewalk, and bus lane, but opens without a barrier to a four-lane roadway with a speed limit of 40 miles per hour.[7] Ex. C, ECF 47; Resp. at 11. After telling Pearson which bus to take, Lerro left him at the bus stop and drove away. Lerro Dep. 53:20-24. Mr. Pearson allegedly sat alongside bystander-Albert Jackson, who recalls that nothing led him to believe that Mr. Pearson was intoxicated. Ex. F, 60:10-17, ECF 47 ("Jackson Dep.").

---

[4] Though not accessible on ECF, the Dashboard Audio was delivered to Chambers as an exhibit on a physical flash drive.

[5] Officer Lerro attributes his inability to comprehend Mr. Pearson to the muffled sound created by the plastic barrier between the driver and passenger in the patrol car. Lerro Dep. 94:23-95:4.

[6] According to Police Chief Brandon Graeff, while there is no formal policy on managing intoxicated individuals, Township police officers are encouraged during standard field training to "use common sense," and to either arrest or detain the individual until they are sober or can be retrieved by a third party. Ex G., 47:11-24, 48-49, ECF 51 ("Graeff Dep.").

[7] Officer Lerro chose this stop because several busses that pass go directly from the stop into the 69th Street Transport Terminal, where Mr. Pearson could transfer to a local route home. Lerro Dep. 45:24-46:9.

Approximately seven minutes after that, Mr. Pearson ventured to cross the street and was fatally struck by a passing vehicle.[8]  Resp. at 7.  Pearson was brought to Main Line Lankenau Hospital, where he was pronounced dead at 8:59 p.m.  The toxicology report revealed that he had a blood alcohol concentration of .238%.  Toxicology Report, ECF 51-3; Lankenau Medical Rec., ECF 51-5.

## II. Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III. Discussion

Plaintiff argues that Officers Lerro, Ditmer, and Stiles are individually liable under Section 1983 for violation of Mr. Pearson's substantive due process rights, and that Marple Township is liable under a *Monell* failure to train theory.  Though Mr. Pearson's death is tragic, no permutation of the facts here rises to the level of a constitutional violation under the state created danger theory.  And this isolated incident does not provide a basis to find the Township liable for failure to train under *Monell*.

### A. No issue of material fact requires resolution

The sole disputed issue of fact is whether Mr. Pearson's intoxicated state should have been obvious to Officer Lerro.  For purposes of the analysis here, I assume that it had to be obvious.  I also pause to note that a jury would almost certainly conclude that it was.  First, Mr. Pearson's speech in the dashboard camera audio recording is slurred, jumbled, and at times incoherent.

---

[8] Plaintiff also brought suit against the driver of the vehicle for negligence in the Delaware County Court of Common Pleas.  *See Vonda Pearson as Adm'x of the Est. of Cornell D. Pearson v. John P. Thomas, Jr.*, CV-2022-006218 (C.P. Delaware).

Second, while in the car, Officer Lerro asks Mr. Pearson about his favorite type of brandy and states that the alcohol was "messing with [Mr. Pearson's] brain." Dashboard Audio, 6:12-17, 6:24-6:26. Third, Mr. Pearson's blood alcohol content at his time of death was 0.238%, a rate that any credible toxicologist would interpret as showing visible signs of intoxication, with rare exceptions. Toxicology Report at 5, ECF 55. Not surprisingly, Plaintiff's expert opined that someone with a blood alcohol content of .238% necessarily would have exhibited outward signs of intoxication, such as slurred speech, (as captured in the dashboard camera audio), accompanied by delayed reaction times, and impaired judgment, vision, and coordination. *Id.* As an Officer given field training in how to handle intoxicated individuals – or simply as an adult with with common sense – Lerro certainly would have known that Pearson was highly intoxicated. But accepting that Officer Lerro knew Mr. Pearson was drunk, Plaintiff fails as a matter of law to establish a state created danger.

### B. Section 1983 State Created Danger

Plaintiff's Section 1983 claim rests on the Due Process Clause of the Fourteenth Amendment, which provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. The Due Process Clause of the Fourteenth Amendment does not impose an affirmative duty on the state to protect citizens from the acts of private individuals. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198-200 (1989). But in *Kneipp v. Tedder*, the Third Circuit adopted the state-created danger theory as a mechanism by which plaintiffs may establish substantive due process constitutional violations under Section 1983. 95 F.3d 1199, 1201 (3d Cir. 1996). Under this theory, "liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or

her Fourteenth Amendment right to substantive due process."[9]  *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006).

There are numerous Third Circuit precedential decisions that consider state-created danger claims.  Each is highly fact-specific in its analysis, with some finding liability and others not.[10]  Although the facts vary widely, the linchpin in each case is whether the state actor's affirmative

---

[9] Defendants argue that post-*Dobbs*, state created danger theories of liability are no longer viable because they fall under the umbrella of substantive due process. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).  Not so.  While *Dobbs* did limit one specific substantive due process right, nothing there directly addressed the continued viability of state created danger claims in the Third Circuit.  To this point, the Third Circuit relied upon *Kneipp's* analysis as recently as March, 2024. *See Ivers v. Brentwood Borough Sch. Dist.*, No. 23-1799, 2024 WL 1088447 (3d Cir. Mar. 13, 2024).  As to whether the right to be free from harmful exercise of state authority is "deeply rooted in this Nation's history," 597 U.S. at 231, such principles were integral to the founding of the United States, starting with the litany of abuses set forth in the Declaration of Independence.

[10] *See, e.g., L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235 (3d Cir. 2016) (finding a state created danger existed where teacher let a stranger take a kindergartener home and the child was assaulted); *Rivas v. Cty. of Passaic*, 365 F.3d 181 (3d Cir. 2004) (affirming denial of summary judgment on state created danger claim where EMT's responded to a man having a seizure, told police officers that the man had assaulted them, and stood idly by while the officers attempted to restrain the man, a medically contraindicated action that resulted in his death); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) (remanding dismissal of state created danger case where 911 call center employee tracked, shot, and killed his ex-girlfriend's new boyfriend using unauthorized call center information); *Est. of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) (reversing grant of summary judgment where individual suffered a fatal heart attack from the stress of an incident involving trooper at his residence); *Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017) (denial of motion to dismiss remanded where a trooper was killed by an accidental shot during a firearms safety training session); *Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir. 1995) (no state created danger for failure to screen potential members of volunteer fire department while hiring); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997) (affirming dismissal of suit where daycare operator left the entrance open, allowing an individual with mental illness to enter and kill a teacher); *Kaucher v. Cnty. of Bucks*, 455 F.3d 418 (3d Cir. 2006) (no state created danger where corrections officer contracted staph infection as a result of defendant's maintaining unsanitary conditions at the jail); *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165 (3d Cir. 2017) (no state created danger where coach required a student athlete to keep playing after sustaining a big hit, resulting in brain injury); *Johnson v. City of Phila.*, 975 F.3d 394 (3d Cir. 2020) (no state created danger where operators provided the wrong location of a building with a fire and people inside died); *Mears v. Connolly*, 24 F.4th 880 (3d Cir. 2022) (dismissing state created danger claim against doctor but allowing claim against nurse to proceed where mother was assaulted by her involuntarily committed son during visitation at a state facility); *Sanford*, 456 F.3d 298 (3d Cir. 2006) (no state created danger where a school guidance counselor failed to adequately intervene to prevent a struggling student's suicide); *Bright v. Westmoreland Cnty.*, 443 F.3d 276 (3d Cir. 2006) (no state created danger where repeat probation violator ultimately killed an eight-year-old girl); *Schieber v. City of Phila.*, 320 F.3d 409 (3d Cir. 2003) (no state created danger where officers declined to enter a woman's home after a neighbor reported screaming and choking sounds and the woman was ultimately killed).

conduct meaningfully altered the balance of risk and definitively placed an individual in harm's way.  Having carefully reviewed the landscape of Third Circuit precedent, I cannot conclude that the facts before me suffice to establish a state created danger under the controlling test.

    1.  *Prima Facie Case*

To prevail on a state-created danger theory, a Plaintiff must prove that: 1) the harm was foreseeable and fairly direct; 2) some relationship existed between the state and the plaintiff; 3) a state actor acted with a degree of culpability that shocks the conscience; and 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or rendered the citizen more vulnerable to danger than had they not acted at all.  *Bright*, 443 F.3d at 281 (citing *Kneipp*, 95 F.3d at 1208-09).  Critically, each element must be satisfied to establish liability.  Although Plaintiff can satisfy the first and second elements, I conclude that Officer Lerro's conduct neither shocks the conscience, nor did it affirmatively place Mr. Pearson in a more vulnerable position than he would have been in absent intervention.  I will address each element in turn.

    a)    <u>A jury could find that the harm was foreseeable and fairly direct.</u>

To establish foreseeability, a plaintiff must show that the defendant was aware of a *risk* of violence or harm, but not that the defendant foresaw the specific circumstances of the harm.  *Arnold v. City of Phila.*, 151 F.Supp.3d 568, 576 (E.D. Pa. 2015) (citations omitted).  Here, a reasonable jury could conclude that leaving a highly intoxicated person alone at a bus stop on the side of a busy road might foreseeably result in serious harm.  *See Kneipp*, 95 F.3d at 1208-09 (holding that the plaintiff's injuries were foreseeable because the officers were aware of her intoxication but sent her home alone in freezing weather).

b)      A jury could find that a special relationship existed.

A special relationship exists where the plaintiff is a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general." *Bright*, 443 F.3d at 281 (citations omitted). Here, Officer Lerro's removal of Mr. Pearson from the parking lot and transport to the bus stop "distinguished [Mr. Pearson] from the public at large," such that the defendant would have had specific knowledge that he faced a particular danger created by his actions. *Morse*, 132 F.3d at 912-13. Officer Lerro's engagement with Mr. Pearson would suffice to establish a special relationship.

c)      Officer Lerro's conduct, even if negligent, does not shock the conscience.

Considering the Marple Township Police Department's protocols for dealing with intoxicated individuals, Officer Lerro's decision to transport Mr. Pearson to the bus stop can certainly viewed as unwise. But no reasonable jury could find Lerro's sincere effort to help Pearson get home conscience shocking. The severity of culpability needed to "shock the conscience" varies based on the circumstances. *Sanford*, 456 F.3d at 309-10. The more time state actors have to deliberate, the less culpability is required. Nothing on the record here indicates that Lerro would have needed to make a pressurized decision. In his incident report, Lerro explained that "there were no signs of any break ins," and the record shows that Lerro and Pearson shared friendly and calm conversation throughout the encounter. Incident Report.

Where an actor has time to make an "unhurried judgment," such as here, a plaintiff need only prove facts to support an inference that the official acted with deliberate indifference. *Johnson*, 975 F.3d at 401. Deliberate indifference is defined as the "conscious disregard of a substantial risk of serious harm," and might exist when the risk is "so obvious that it should be

known." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 246 (3d Cir. 2016); *Phillips*, 515 F.3d at 241. "Mere negligence is not enough to shock the conscience." *Sanford*, 456 F.3d at 311.

Given that negligence will not suffice, the question is whether Officer Lerro's choice reflects that he was deliberately indifferent to Mr. Pearson's safety. I could not sustain a jury verdict finding that he was. It is true that Lerro could have taken Mr. Pearson into custody or called one of Mr. Pearson's phone contacts to come pick him up. But it cannot be said that Officer Lerro's ultimate choice to give Mr. Pearson a courtesy transport to the bus stop showed conscious disregard of Mr. Pearson's safety. At best, Officer Lerro was earnestly trying to get Mr. Pearson home safely on the most direct route available to him within the confines of his job responsibilities, without resorting to the more drastic alternatives of arrest or protective custody. At worst, Lerro thought he was helping Pearson get home, but seriously miscalculated Pearson's ability to get himself on the bus safely in his intoxicated state. Either way, I cannot say that Lerro's arguably poor choice rises to the level of a constitutional violation. *See, e.g., Schieber*, 320 F.3d 409, 423 (3d Cir. 2003) (finding officers were not deliberately indifferent in a far more egregious circumstance, where they declined to enter a woman's home after a neighbor reported screaming and choking sounds and the woman was ultimately killed); *Sanford*, 456 F.3d at 311 (finding that a school guidance counselor was not deliberately indifferent where she failed to adequately intervene to prevent a struggling student's suicide).

> d) <u>Officer Lerro's affirmative intervention did not place Mr. Pearson in more danger than he would have been in absent intervention.</u>

"It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282. For a triable issue on this element, a plaintiff must show both that a state actor affirmatively used their authority to act, and that the act either created a

danger or increased the risk of danger to the plaintiff. A state actor cannot be liable for a failure to protect. *DeShaney*, 489 U.S. at 197.

As set forth above, a jury could reasonably find that Officer Lerro affirmatively used his state authority to transport Mr. Pearson from the mall to the bus stop. While Pearson solicited the courtesy transport and was technically free to go at any time, the record shows that Mr. Pearson did not share this perception of his freedom. While in Lerro's car, Pearson stated "I ain't trying to get locked up," "I'm not a thief…I'm a good guy…wrong guy…I understand you're doing your job." Dashboard Audio, 4:00-4:08. Although Lerro tried to convey that the transportation was optional, Pearson, in his highly intoxicated state and in the presence of a uniformed officer called to investigate his own behavior, likely did not understand the voluntary nature of the transport. Officer Lerro thus affirmatively acted with state authority.

Officer Lerro's intervention also resulted in a change of circumstance. There is an "inherent difficulty in drawing a line between an affirmative act and a failure to act," for "virtually any action can be characterized as a failure to take some alternative action." *L.R.*, 836 F.3d at 242. Rather than frame the inquiry as one of act or omission, it is helpful to first consider the "status quo" of the environment before the alleged act or omission and then consider whether the actor's exercise of "authority resulted in a departure from that status quo." *Id.* at 243. Here, Pearson's status quo was ambling about a crowded parking lot. By intervening, Officer Lerro altered the status quo, moving Pearson to the bus stop, a different landscape.

But the inquiry does not end there. To establish the fourth element, a plaintiff must also show that the state's affirmative act rendered the plaintiff *more vulnerable* to danger than he would have been had the state not acted at all. *Id*. at 244 (finding affirmative creation of danger where a state actor's actions "resulted in a drastic change to the status quo, not maintenance of a situation

that was already dangerous."). The issue is whether moving an abandoned and intoxicated Mr. Pearson from the parking lot where he had spent the past several hours to the bus stop to get home meaningfully escalated the risk of danger.

On this point, Plaintiff argues that this case falls squarely within *Kneipp*. There, the plaintiff was a visibly intoxicated woman on the way home from a local tavern with her husband on a freezing winter night. *Kneipp*, 95 F.3d at 1201-2. When the couple was less than a block from home, police officers stopped them for causing a disturbance. *Id*. Following questioning, the officers let the husband go home to relieve the babysitter but kept the wife for several more minutes. *Id.* The officers then let the wife go on foot – now without her husband – despite her highly intoxicated state and the freezing weather. *Id.* The wife was later found unconscious at the bottom of an embankment near her apartment and suffered serious injury. *Id.* at 1203. The Third Circuit held that the plaintiff's injuries were foreseeable because the officers were aware of her intoxication but nevertheless separated her from her husband and sent her home alone in hazardous conditions. *Id.* at 1208. And "but for the intervention of the police," it was likely that the plaintiff would have returned home unscathed, her husband nearby to ensure her safety. *Id.* at 1209.

Unlike *Kneipp*, where action by the police separated the victim from her husband and left her isolated and vulnerable to danger, Mr. Pearson was already on his own. The Complaint alleged that Pearson was waiting for his girlfriend to finish work at Marshalls and drive him home and thus had a companion. But discovery revealed that Pearson's girlfriend was never at the shopping mall or available to drive him home. Nor did Mr. Pearson have any other ride home: his niece and friend had both already left, and the record shows that Pearson was inaccessible on his cell phone. The crux of *Kneipp* was that the actions of police deprived the plaintiff of a safe means of reaching home, whereas Officer Lerro's intervention here did not.

Accepting that Mr. Pearson was alone in either situation, the operative inquiry is whether Pearson faced a greater risk of harm at the bus stop than he did in the parking lot. One can debate whether the parking lot was marginally safer than the bus stop was or *vice versa*. It is true that the bus stop abutted a road with cars moving at a higher velocity than cars would be moving while maneuvering around a parking lot. But this factor alone does not dramatically shift the danger calculus, especially where cars in parking lots often move erratically, backing out and turning without warning, and this was a Saturday night at the beginning of the busy holiday shopping season. The bus stop was also illuminated by nearby business signage and sat behind a sidewalk, a curb, and a bus lane, further distancing Mr. Pearson from passing traffic. Plaintiff falls well short of establishing that the bus stop could be viewed as definitively *more* dangerous than was the parking lot. *See, e.g.*, *Est. of Viola v. Twp. of Bensalem*, 96 F.Supp.3d 466, 471 (E.D. Pa. 2015) (fourth prong not satisfied where a student was struck crossing a busy road to get to his school bus stop because the neither the municipality's decision to put the bus stop there, nor their failure to employ a crossing guard for more hours or to fix the broken cross walk button were affirmative acts that placed the student in heightened danger); *cf. Arnold*, 151 F.Supp.3d at 577 (fourth prong satisfied where officers moved an intoxicated woman whose purse had been stolen from the area near her house to a high crime neighborhood alone).

Here, Mr. Pearson was intoxicated, stranded, and in some danger in either situation. While the specific dangers in the parking lot and at the bus stop might differ in kind, the overall risks are comparable.[11] This simple change in location cannot support a violation of the Constitution. For state action to shock the conscience, it must meaningfully alter the risks faced by the person

---

[11] Protective custody would of course have eliminated the risk, but a failure to act cannot support liability under a state-created danger theory, and any negligence on Officer Lerro's part does not fall within the enumerated exceptions to immunity in Pennsylvania's Political Subdivision Tort Claims Act.

affected.  *See, e.g., L.R.*, 836 F.3d at 247 (finding a state created danger existed where schoolteacher let a stranger take a kindergartener home and the child was assaulted); *Rivas*, 365 F.3d at 197 (affirming denial of summary judgment on state created danger claim where EMT's responded to a man having a seizure, and stood idly by while the officers attempted to restrain the man, a medically contraindicated action that resulted in his death).  I conclude as a matter of law that Officer Lerro did not intervene in a way that exposed Mr. Pearson to any danger he did not already face, and summary judgment on Plaintiff's Section 1983 claim against Officer Lerro must be granted.

### C. Officers Ditmer and Stiles

Plaintiff concedes that Officer Ditmer should be dismissed because she did not perform any affirmative act as required under the state created danger theory.  Summary judgment must also be granted as to Officer Stiles for the same reasons set forth above.  The claim against him also fails because there is no evidence in the record that Officer Stiles knew or had any reason to know that Mr. Pearson was intoxicated and approving a standard courtesy transport without more cannot ground a state created danger claim.

### D. *Monell* Liability

Plaintiff also argues that Marple Township should be held liable for its alleged failure to train officers how to safely handle a highly intoxicated person.  In some instances, dismissal of individual liability also necessitates the dismissal of municipal liability.  *See Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("There cannot be an 'award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm.'")).  But at least in the state created danger context, the Third Circuit requires that district courts independently evaluate *Monell* liability, notwithstanding a conclusion that there is no individual

liability. *Kneipp*, 95 F.3d at 1213 ("The precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual police officers, as the City's liability for a substantive due process violation does not depend upon the liability of any police officer.").

While a municipality "cannot be held responsible for the acts of its employees under a theory of *respondeat superior* or vicarious liability," it may be held liable where a plaintiff proves that an "action pursuant to official municipal policy" caused their injury. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003); *Monell v. N.Y.C. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A pattern of similar violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for the purposes of a failure to train claim. *Id.* at 62. But in rare instances, a "single-incident" can substitute for the showing of a pattern, where that incident is the "highly predictable consequence" of the purported failure to train. *Id.*; *Bd. of Cnty. Cmm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 399 (1997).

Plaintiff cannot show that Marple Township systematically failed to train its officers. First, Plaintiff does not identify any pattern of similar harms at the Marple Township Police Department, nor do they identify any instance where a situation like this has ever occurred before. Plaintiff has therefore not established a failure to train claim based on a persistent pattern.

Nor is this single incident sufficient to substitute for the showing of a pattern of similar injury. Failure to train liability premised on a single incident is extremely rare and should be reserved for "the narrow range of circumstances" where one might have no basic knowledge about

their constitutional obligations in the absence of training. *Connick*, 563 U.S. at 64 (discussing *City of Canton v. Harris*, 489 U.S. 378 (1989)). This is not such a case, for Officer Lerro would not need extensive training to discern that leaving an intoxicated individual on the side of a road could result in serious harm. *See id.* (holding that failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of single-incident liability because attorneys are generally trained to understand constitutional limits and exercise legal judgment); *cf. Canton*, 489 U.S. at 391 (leaving open the possibility of single incident liability in situations where armed officers have *no knowledge at all* of the constitutional limits on the use of deadly force).

Additionally, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S at 390-91. The record shows that Officer Lerro received standard police officer training. And according to Chief Officer Graeff, the police policy for dealing with intoxicated individuals is taught during standard field training, where officers are encouraged to "use common sense," and to either arrest or detain the individual until they are sober or can be retrieved by a third party. Graeff Dep. 47:11-24, 48-49. There is nothing in the record to indicate that Lerro's failure to follow Department policy was due to inadequate training, rather than a simple lapse in judgment. Although Plaintiff retained a police procedures expert, his report seems to concede that the officers involved underwent appropriate field training on relevant police policies and does not attribute Officer Lerro's decision that night to any training deficits. ECF 55 at 21-28. The expert's opinion might support recovery for negligence against Officer Lerro, but as noted above, Pennsylvania law confers immunity.

Mr. Pearson's death is undeniably tragic, but Officer Lerro's poor judgment, without more, cannot support a finding that Marple Township systematically failed to train its officers. I will therefore grant summary judgment on Plaintiff's *Monell* claim.

## IV.    Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted in full. An appropriate order follows.

     /s/ Gerald Austin McHugh
United States District Judge